Okay, when you're ready. Thank you, Your Honor. Excuse me. Good morning. I'm Richard Sagerbloom. I'm the attorney for the appellant Marcy Brown. This case involves a cellist who played for the O Show, which is one of the Cirque De Soleil shows in Las Vegas, and I was thinking that Judge Huyck would appreciate this, that instead of having topless dancers, Las Vegas has gone to the point where now we're fighting over a cellist. But this show is a very elaborate production and has an orchestra-quality band as part of the show. My client was hired as a cellist, but she also, they have a, if you look at the stage above, the band is actually, instead of down below, it's up above on the right. During the show, some of the band members go down and actually perform on the stage, so she also was a singer, and she would walk back and forth with her cello as part of the show. So she actually had three roles in the show. The claim here is, there's two claims. First is that she was terminated because she was injured on the job, and the second claim is she was terminated because of her age, and I'd like to go through both of those. With respect to the injury, she had, I said she had three roles. One of them was playing the cello. She got tendinitis in approximately, in early 2003, and in March, there was a three-week period where she did not play the cello. She just did the performance and sang on the stage. At the end of that period, and the band, or the production had a way where we used a tape recording of the musician to substitute for the play. So the actual performance, the cello was still playing, but it was a tape and there were problems with the tape. So at the end of that three-week period where she was unable to play the cello, there was a meeting held of the band, and there were complaints about people using the backup system and that they were essentially faking not being able to play, and that was by the head of the production, this ballerina. Was there any charge that she was doing it? I gather that there were several people in the end terminated, not limited to your client. Was there charge in that meeting that she was faking her injury? They didn't name the people, but the charge was that these people were abusing the backup system. The only three people who were using the backup system at the time were three people who had been injured. Now, abusing the backup system doesn't necessarily mean more precisely that you're faking an injury. Was there a statement of faking an injury in any of the evidence here? Yes. Two months later, in May, one of the people, not my client, but one of the other performers met with this ballerina, and in that conversation, he actually made comments about people faking injuries, and that's in the record. But that earlier meeting about abusing, there's no evidence that there was a talk of faking injuries at that time. But they were upset, and the three people who were using the system were, in fact, injured on the job, and there was comments about, you're abusing the system, you don't have to, you should be down there playing and not doing things. Now, the other thing is, and this is the final comment about, they allege three people were involved in the termination. There's Bollinger, who actually worked there in Las Vegas and ran the show, and then there were two musical directors, outside consultants, who he claimed that he consulted with. There's a memo from one of those consultants, and in that memo, he states why he wanted my client to be fired was that she wasn't able to, she was complaining a lot and not able to play quite often. So again, he's referring back to the fact that, and there was only this three-week window when she didn't play. During the entire time she was there, over a year, she played everything, no problems, but just the one three-week period. Now, the other thing that's important is that she did file a workers' compensation claim. So it's not just she wasn't able to perform, therefore we're going to fire her. Now, when we filed them, they filed their motion, on this particular claim, Nevada has said since 1984 that if you're fired in retaliation for filing a workers' compensation claim, you're protected. It's a tort claim. They argued, well, my client in deposition was asked, were you fired because you filed the claim? And she said, no, I think I was fired because I didn't play, which her subjective belief shouldn't matter anyway. But anyway, in the motion, the judge said, well, because she wasn't fired because she filed the claim, she was fired because she didn't work. That's not protected. Although, at that point, you're in trouble because, obviously, the only evidence we've think she was fired because she didn't play is the sequence of events, because, obviously, they're not going to say we fired her because she fired a workers' comp claim. So every live person says that's not the reason. Well, but, of course, they would never admit that that's why they fired her. My point is, once your client agrees with them on that point, the only thing we've got is the inference from the time sequence. Well, but the other side is the fact that you should be protected, not just the technical signing of the piece of paper saying I'm injured. It's the protected conduct is the fact that these statutes provide that if you are injured, then you don't have to work on certain days because of that injury. So your protection goes beyond just the fact that you technically file a piece of paper. The statutes are broader as far as you have to file the claim, then if you're not able to work, you can tell your employer I can't work, and you're protected there. And at some point, if you have a permanent injury, you're entitled to permanent compensation. So to just focus on the- What's the Nevada law with regard to that, that it is the filing of the claim or the injury? Well, that's the crux of the issue. As you know, Nevada doesn't make a lot of decisions. We made this decision in 1984, and it was very preliminary. I mean, we were one of the first states to find this tort. There's no case since then that has really talked about it. And there's some language in that first case that says it's the filing of the claim that is protected. But it also is broader. It talks about the liberally construing and the fact that people shouldn't have to choose between working and not working to keep their job. So if you really look at the language, it talks about bigger claims. And then if you look at other states like Kansas, which has a very similar statute and very similar cases, they've actually gone in and looked at this issue more specifically. But in my opinion, there's no reason to distinguish between just the technical of the claim, which you want to do, but if you're subsequent to that, there's a couple of days you can't work. You shouldn't be able to fire them because they didn't work because they were injured. Now, if they said, you know, you're just not here enough to be able to work, and that's one of the reasons we're going to fire you, then that could be an issue maybe. But that's not what they said in the record. Their record was they used other issues as far as why they fired her. And again, let me take that in a slightly different direction. I'm not regularly conversant with Nevada law, but I encountered a case from the Supreme Court of Nevada in 1998 called Allum v. Valley Bank, which says, and I'll just read a sentence. We hold that recovery for retaliatory discharge under State law may not be had under a mixed motives theory. Thus, a plaintiff must demonstrate that his protected conduct was the proximate cause of the discharge. And you say they've got this array of other explanations for why the action was taken. Even if we accept your argument that Nevada law covers injury, not just filing a worker's comp claim, there were other things sitting there. And what is it about your case that will survive the question as to whether it was a mixed motive, which apparently would be fatal to your claim? Well, first off, that would be a question of fact. Secondly, if you look at the timing, she files the claim in early March. She has this three-week period where she doesn't play the cello. There's a meeting held right after that period where the director complains that you guys are abusing the backup systems. Doesn't talk about her not being able to come out of the walk around or whatever else. Doesn't talk about bad chemistry with the band leader. Talks about the fact that people are abusing the system. And then the meeting seems to work. I mean, she's not failing to play any longer. Right. And then some months later, she's terminated. Right. I have trouble making the connection between a failure to play in March and termination that happens some months later after she apparently has responded to what might have been an unlawful threat. But she started working again. So to that point. Now, there's a memo in the file which says, and this memo is dated in early April, where the guy says, our plan is to fire her. Here it is, April 2nd. And it's page 189 of my extracurricular record. The indication there is going to replace her with this younger woman, which is a week or two later after the meeting and after the. You can see it's on the side, but it's. So that's the tie in. And then, of course, there's this this memo that was written after it's item number five at the bottom of that page. You can see it. No, I'm sorry, I don't know before. Replace Marcy Brown on. So that memo is dated April 2nd. So to me, that's very close proximity. And then I said there's the memo after the fact by one of the three people they claim fired her. And that memo basically says, I don't know why to fire her, but if we're going to do it, it's because I heard that she wasn't able to work, perform. And the only time she was unable to perform was back in this three week period in March. So your argument is that this April 2nd correspondence or subject to a jury that the sole motivation for hiring, firing her was her injury and workers comp claim. Had she filed her workers comp claim by the 2nd of April? Yes, it had actually been filed before she went out back in, I think it was actually filed early in the year, but she didn't actually miss work until that period in March. Oh, so let me understand this. This may be a separate but and irrelevant question, but answer. So even before she is missing work, she's filed a workers comp claim? Right. And why has she done it before she's missed work? Well, it was tendinitis and she was starting to feel that something was going. So to protect herself, you're supposed to file as soon as you feel the injury. Even if you have not yet missed work, I see, okay. But again, it was only this one brief period where there's no history of absenteeism or anything like that. And she was never counseled for absenteeism or, but again, with respect to the mixed motives, what you do is it's a because of was this the factor that made the difference? I mean, there can be other things out there, it's just not, this has to be the factor that was over the top. And that's where the McDonnell Douglas type of burden of proof shifting comes in. And we believe, you know, given the timing of the sequence and the one guy's comments that we ought to get rid of her because I hear she can't, doesn't play very often, goes to that issue. Okay. You know, this memo is quite interesting because it doesn't say anything about injury. Maybe I wouldn't expect it to, even if injury were the underlying cause. What it talks about is once it moves beyond talking about the situation with Jean Paul as the band leader, it talks about the general attitude and professionalism of certain band members is unacceptable and causing friction. And then she's one of the band members who's being fired from which the natural inference is somehow that her general attitude and professionalism isn't quite right. Right. But again, I mean, these can all be code words. Professionalism, you don't play through your injury. It's like if you analogize it to a football player or something like that. I mean, these are, these people do two performances a day, seven days a week, so it's a strenuous job. But again, there's no, like, long-term history of any absentee problems or anything like that. So. Okay. With respect to the other issue, which is age, I would concede that's a tougher question, but my argument on that is the judge found we proved a paper facial case. They came back with their explanation, and then we had to show, you know, evidence of pretext. The band leader, before my client was actually brought on, knew she had been hired and made very disparaging comments and mimicked her, walked around. He wasn't the decision-maker because he got canned, too. Well, that's the problem with that. He relied on his judgment because they were getting rid of him. Well, but the basic was that she couldn't get along with him. He was a poor leader, and she wouldn't follow. And I guess my problem is that if the reason he doesn't get along with her is because he doesn't like her because of her age, then doesn't age, isn't age inextricably tied into this ultimate decision? Because that seems to be, their two arguments are, well, the one is about not being able to work. The other one is that there was this conflict between my client and some of these other people and the band leader. And if he doesn't like, I said, her because of her age, then that's age is somehow involved in it. And the other is she thinks. . . The big problem on not being able to get along is they will get rid of them both. Yeah. Well, I guess that's my problem is that you throw out the baby with the bathwater and maybe somebody is an innocent victim of discrimination and the people above say, Well, we didn't know that. But, again, they were told in a memo about this guy's conduct towards her as far as mimic her and mocking her age. So they had knowledge ahead of time. My client didn't know that, but they had knowledge that there was a conflict based on age before they decided. . . Maybe that's part of the reason that he got canned was that. . . Well, if you know the whole story, yes, and some other issues. But, so anyway, that's, I guess, the crux of the problem is that we have these comments. They're kind of tied up in the conflict within the institution. The other interesting thing about this case, which may or may not be relevant, is they actually have a very elaborate program. And in the program, they literally have everybody's date of birth. And it's a very young cast. And so just going through the program and looking at the ages, my client, even though she's only like early 40s, stood out in her age. So everyone is very cognizant of age in this company. Okay. Why don't we hear from the other side and then you've got quite a bit of time to respond. Thank you. Good morning, Your Honors. May it please the Court, my name is Scott Abbott, and I represent the appellee Cirque du Soleil in this matter. Let me begin my comments this morning by addressing the workers' compensation retaliation claim. As my colleague has pointed out, Nevada has recognized a tort for tortious discharge in connection with the filing of a worker's compensation claim. The last 20-some-odd years. It's very important to understand from the Hansen decision, which has been cited by both parties, both below and in the record on appeal, that that case narrowly circumscribes the tortious discharge element. And that is because the public policy, as recognized by the Nevada Supreme Court in the Hansen decision, is to provide economic security to people who are injured in the course and scope of performing their duties. The statutory right, if you will, that's conferred upon such employees is to file a claim so that they can receive temporary total disability payments for any period of incapacity or absence from their regular job duties. Since the Hansen decision, none of the Nevada courts, including the Nevada Supreme Court, have seen fit to expand the scope of that particular cause of action. And we don't believe that it should be expanded here. The issue in cases where public policy discharge claims are evaluated and analyzed is whether the employer's action in, let's say, making a termination decision, would effectuate a chilling effect on the person's exercise of that statutory right. Employees don't have a statutory right to be injured. They have a right to file a claim based on that injury so that they can receive economic benefits. And in fact, factually here, there really are no disputed issues of fact. And we believe that the court below did appropriately grant summary judgment. In response to some of the comments that were made a moment ago, Ms. Brown filed her workers' compensation claim in January of 2003. That was six months approximately prior to her termination. CERC de Soleil has no hostility, as shown in the record, for anyone who files a workers' compensation claim. There are a number of people, given the nature of their business operation, who have filed claims. Many of them have filed multiple claims. And many of them continue to be employed. This is not a statutory right. I have your argument. I'm going to ask a question that I don't want you to extend. I just want to make sure I know what you're talking about here. I'm focusing on the distinction between filing a claim and being injured. And is it your position that Nevada law does not extend the protection against retaliatory discharge to the being injured element? That's correct. Are you accepting as a factual proposition for purposes of summary judgment that plaintiff was terminated for being injured? No, I'm not. Okay. So to that extent, at least, there are factual disputes. If we get to the point, if we would conclude, for example, that Nevada law would extend the discharge, retaliatory discharge theory to discharge for being injured, as to that, we do have a factual dispute. Well, I would disagree with that only from the standpoint of there were multiple reasons asserted based upon the conduct of Ms. Brown that precipitated her termination. I'm not looking for you to argue that. I just want to make sure I know where you're coming from. Okay. Understood. In fact, to show my client's lack of animus towards anyone who files or seeks protection under the workers' compensation laws, they actually maintain a policy that exceeds the statutory minimum for compensating injured individuals. Under the Nevada statutory framework, injured employees are entitled to receive 66 and two-thirds of their pay. According to Cirque du Soleil's internal policies, Cirque makes up the difference between 66 and two-thirds and 75 percent. So injured employees, like Ms. Brown, actually receive more favorable benefits under Cirque's own internal policies. And in fact, that shows very significantly, in my view, a lack of animus or predisposition against anyone who files a workers' compensation claim. When you look at it from a temporal proximity standpoint as well, we're talking about a six-month period of time whereby Ms. Brown's own admission, she was only incapacitated for a very short period of time. We don't believe that a six-month period of time confers or suggests a conclusion that there was some retaliatory animus being harbored. What there was was significant concerns about her behavior as a musician in the band. And let me speak for a moment about this March 2003 meeting that my opponent has referenced. There was, as the court pointed out, no reference to any specific individual about faking an injury or being injured. What there were were multiple concerns being addressed to the band as a whole, which included Ms. Brown and her colleagues, that they were doing things that were inconsistent with management's direction. For example, there were selective portions of the backup system being utilized. And what the artistic director said at that meeting was that it's difficult to integrate some prerecordings on the backup system with live playing of the orchestra, but implicit was that either you use the entire backup system or you play live. He didn't say that overtly, but clearly in his declaration what he was concerned about was a difficulty in integrating selected portions of the backup system. Let me make sure I understand that point just as a mechanical or sort of musical matter. The idea is that if you have one person who's not playing, it's difficult to integrate the backup tape of that person with the rest of the live orchestra? No, what it goes down to, my understanding, not being a musician myself, is that there's a prerecording on the backup system of, let's say, Ms. Brown's part in the show as a cellist. What was happening and what the concern was is that at certain intervals she would use the recording. And the sound department, which had to integrate this system by knowing when to cue up the recording, wouldn't know when she was going to play live versus when they would have to use the tape of her recording. Does that mean, and this is just going to be a record question, and I don't know the answer to this, during this three-week period when she was sufficiently incapacitated that she was not playing, are you telling me that she was playing sometimes during this three-week period? It's my understanding that she chose in certain respects to play a portion of her role and not necessarily not perform at all. During this three-week period? Correct. Is there any problem with that backup stuff during other than the three-week period? Not from the standpoint of other than it goes to the criticism by the composer and the musical director that the live quality of the music is somewhat being compromised. But it's only during that three-week period, huh? Well, the... She wasn't abusing it at other times. No, that's not actually true. The backup system had been used on a continuous basis, and one of the criticisms was that artists, excuse me, musicians were trying to get out of performing live by just relying upon the prerecorded issue. This had been a recurring theme. It reached kind of a fever pitch. See, my question is whether it is only during this three-week period or at other times. No, the meeting where that was addressed, where the backup system was addressed, my understanding was, and the record reflects, that it was an ongoing concern dating back to probably fall of 2002. This meeting that we're talking about occurred in the spring of 2003. And does the record contain an indication how many musicians were using the backup system to replace some or all of their live playing? I don't believe that there is, other than perhaps a declaration offered by the plaintiff in this matter, Ms. Brown, suggesting how many others there were. Okay. The issues with respect to the workers' comp retaliation claim also go to the aspect that the court below or this court on appeal, any, in our view, persuasive authority. The only authority that she relies upon are two cases from the early 2000s premised out of the 10th Circuit. And both of those cases rely upon a case named Coleman v. Safeway Stores. And that's actually a 1988 case, so it's not distant in terms of time from the Hansen decision in 1984. That Coleman case is a Kansas Supreme Court opinion, where the Kansas Supreme Court decided that under its statutory framework, they were going to expand or broaden this notion of tortious discharge in retaliation for filing a workers' compensation claim. And both of the cases that are cited by the appellant deal with terminations for violations of an attendance policy. And we believe that they're actually factually inapplicable to the situation at hand, because in one case, I believe it was the Foster case that cited that actually one of the bases for the court's holding that there was some retaliation was the fact that the timing occurred within about a week's period of time after the company received notice that a worker had filed. We certainly don't have that situation here. We have a situation where six months had passed since the filing of the claim. We also have a situation here where multiple individuals were terminated, a total of four in June of 2003, including the musical director, Mr. Gasparelli, who the court has addressed previously, as well as two of the other musicians. And we have a situation that Ms. Brown was terminated in retaliation for seeking workers' compensation protection. Have you put anything into the record with respect to the other three terminated employees and their filing of workers' comp or not filing of workers' comp claims? My understanding is that we did not. Is there anything in the record with respect to that? I believe there are a declaration or two by the other two saying that they had had workers' compensation claims that were open. And do we know the dates that those workers' comp claims were submitted? One of them, I believe, for Ms. Marceau was, I believe, in May of 2003, as to Mr. Jutra. I don't know the date on that. Okay. Maybe Ms. Brown's lawyer can help us on that. Thank you. We believe that the workers' compensation tortious discharge claim is narrowly interpreted in its present format by the Nevada Supreme Court. Nevada hasn't chosen to expand it in over 20 years since the Hansen decision was decided. And the mere fact that Ms. Brown cites to a Kansas opinion that's been endorsed by the Tenth Circuit is not necessarily binding nor persuasive. We believe that if Nevada, which does have a compelling state interest in announcing and judicially recognizing the public policy of its state, we believe that if an expansion were appropriate for the sake of argument, that that decision-making should be left either to the Nevada courts or the Nevada legislature. You're not really asking us to certify this question to the Nevada Supreme Court, are you? No. No. No. So you want us to ask them, but you really don't want us to ask them. I'm correct. Okay. Let me turn for a moment to the age claim and address my comments to that in the time I have remaining. This case really is a stray remarks case. That's all that Ms. Brown has. And she's got several undisputed facts that the parties in fact both share that diminish and undermine that claim. For example, it is undisputed that when she was hired by CERC, she was over the age of 40. She was actually 41 years old. She was actually preferred to the younger woman who subsequently replaced her about a year and a half later. Mr. Bollinger, who is the artistic director, who incidentally is the same age as Ms. Brown, was the decision-maker to hire her. He was also the decision-maker about a year and a half later to terminate her. And there's authority for that proposition that where the same decision-maker both effectuates a hiring and a later termination decision within a relatively short period of time, that that diminishes the argument that age was the factor who was motivating the decision. In the McDonnell-Douglas context, you aren't contending that there is no prima facie case, are you? Well, we had argued below that there was a lacking element to the prima facie case, which was the necessary element that she was satisfactorily performing her job, because the evidence shows in the record she was not. And, in fact, her attitude, her negativity, and her lack of abiding by supervisory direction. On this appeal, you're contesting the prima facie case, right? Well, we contested, but we understand where the lower court was coming from. The lower court was coming from the prison. What I'm trying to find out is whether we're to deal with that on an appeal. Well, I think the ultimate issue here for this appeal is whether or not the plaintiff, Ms. Brown, can actually prove pretext. That's the crux of this. If that's getting to the third step. Yes, exactly. I'm just saying that, you know, that was our argument below. I still believe that to be true. But we understand where the lower court was coming from. If we're to deal with what we have before us here on the appeal. Yes, absolutely. And to that point, we say that the lower court was correct in establishing in its grant of summary judgment that Ms. Brown could not overcome her burden to show substantial and specific evidence of pretext. Which is the standard that's been espoused by this Court in its Godwin decision. All she has are the stray remarks by her supervisor, Mr. Gasparelli, whom the Court's already acknowledged was part of the team that was terminated. And, in fact, the record is clear. He was not a decision maker. His input was not solicited. And so his comments, regardless of how offensive they might have been and how long ago they may have been, is irrelevant to the analysis. Well, I won't say it's entirely irrelevant. It may diminish their force. I mean, if there's an atmosphere of making fun of old people in the workplace, that's not entirely irrelevant. Well, granted. But for purposes of the decision to discharge, it isn't germane to the idea that there was some harboring of ageist animus. Because Mr. Gasparelli, whatever his comments may have been way back in time, he was not given the opportunity to share those comments or any comments, for that matter, in the decision maker's ultimate determination to terminate. Was there any statement when he was fired that remarks such as those were part of the basis for his being fired? No. No. The bottom line here was that there was dysfunction among the orchestra. He was not in the capacity, much to Sirk's chagrin, to provide the necessary leadership and command the respect of the band members. And likewise, the band members didn't respect him. They weren't abiding company management, decision making. For example, a big issue that came up in this March meeting that we were discussing earlier was the fact that Ms. Brown and others were leaving the sound booth during the actual performance of the show. The booth was visible to the audience in the theater. And Mr. Bollinger was quite upset, not because he heard it from other people. He saw this for himself. People would actually climb over other musicians to get to the door and would leave the booth during the performance. Very unprofessional behavior, very disruptive behavior. We understand that Ms. Brown disputes that, but the fact is that's not Ms. Brown's call to make. The fact is that was the displeasure that Mr. Bollinger and the others in management had with her and some of the other people. In addition, the negativity, the attitude where she had disparaged other members of the company, these all factored in to the decision ultimately to let her go. And going back for a moment to the age issue again, the only other evidence, if you will, that Ms. Brown alleges is that Mr. Bollinger had made comments to her periodically, referencing the two of them as being experienced in the business, or being veterans, that they were. They had survived a long time. Ms. Brown tellingly testified in her deposition that she didn't take offense by any of those comments, she didn't regard them as negative, but later on now she tries to bootstrap them to some ageist animus by Mr. Bollinger, the decision-maker, who incidentally happens to be the same age as her, which diminishes her claim. We submit that under this Court's precedent in both the next case. Kennedy. Why does that diminish her claim? It diminishes her claim because it's less likely that someone the same age as the affected individual would act against that individual for some animosity towards that person's  Really? Well, I think that there's... I don't know that it necessarily is dispositive, but it certainly diminishes the claim. Okay. The issue fundamentally is that also there were other people, as I mentioned earlier, who were terminated at the same time, two of the four who were under the age of 40. And I believe that that also undermines her claim that age was the motivating factor. The people involved in this process, both Mr. Chaput and Mr. Jutra, were also within the protected age group. And I don't believe that her being hired at age 41 and being terminated at age 43 is necessarily indicative of ageist animus, particularly when she has lack of evidence that age really played that role. The only thing she hangs her hat on with respect to her age claim are the comments by Mr. Gasparelli, who admittedly was not a decision-maker, and Mr. Bollinger. Your time has run, and you're going over ground that you've gone over already. If you have a sum-up, we would be happy to hear it. Absolutely. Thank you, Your Honor. Basically our position is, is that summary judgment was appropriately granted by the district court below. This is a stray remarks case on the age claim, and we don't believe that any of the evidence that Ms. Brown has come forth with on the stray remarks issue demonstrates any pretext that would invalidate the summary judgment ruling. As to the workers' compensation retaliation claim, that claim is narrowly drawn and narrowly circumscribed by the Supreme Court of Nevada, and we don't believe that that should be expanded in the context of this case. And we would ask that this Court respectfully affirm the district court's decision. Thank you. Thank you. Mr. Shackelborn, you've saved some time. Just briefly, I have questions. But first off, with respect to the question of the retaliatory discharge and was there cause and effect and things like that, the judge never got there because he just said, because she's claiming it's her injury and not her filing of the claim, I'm not going to look at the claim at all. So he never examined whether there was an approximate cause or any of those other elements. With respect to the question of whether she left the booth at times other than those three weeks, I had thought that you had indicated it was only three weeks, and apparently that's not right. Well, all I can tell you is what the record says. I had never heard that before today. The record is just, and there are three actually affidavits in there from the three people who were injured and were fired. And they all three say that they were not able to work during that period because of their injuries. But there's nothing in the record that says that they previously had missed, didn't perform or used the backup system, nothing. And I had not heard that before. Could you point me to those affidavits? Yes. My client's affidavit is Exeter Record 133, and that's where she talks about that she was using the backup system during March, and that there were three people who were not using the backup system at that time. They were all three using it because of injuries. The other two declarations are from the other two people. Marie Marceau is Exeter Record 128. And Rayel Dutras, who's a different, not really another guy, and he's at Exeter Record 139. Okay. Thank you. And then with respect to the question came up as whether Mr. Gasparrelli, the company, was aware of his abusive behavior. Going back to that earlier memo, which is on 197, the actually this is a different one. This is a June 13th memo on page 197. In that, they talk about that he never had the proper management skills to deal with diverse styles of musicians and talks about inappropriate sexual advances and harassment accusations as being one of the reasons why he was let go. So Mr. Bollinger never indicated that it was a problem of Ms. Gasparrelli's. Yes, Your Honor. And that's the record. Now, he may know something I don't know. But as far as I know and as far as what's in here, that was the only time period that it dealt with. And that's why it was so. I'm not sure I understand your answer. There is an affidavit for Mr. Bollinger that makes reference to leaving the sound room. But it doesn't say anything other than that period of time, to my knowledge. Thank you. Now, do we have anything on the record with respect not only to injury of these three musicians, but of their actual workers' comp claims? With respect to Mr. Jutras, I attached his claim. Well, I attached a letter from a doctor regarding his claim. Okay. Which is? That's actually page 141. With respect to Ms. Marceau, I don't. Okay. I'm just looking for that one issue about. I'm just not aware of anything else in the record with respect to the backup system other than that three-week period. So I'm personally not aware of it. Is there some argument that you might have that responds to the argument that says, well, wait a minute, Cirque du Soleil is very generous with respect to workers' comp. We don't fire people for workers' comp. Is there something special about workers' comp and the band that takes your case out of that sort of general treatment of workers' comp claims? Yes, in the sense that there was this conflict with the, you know, if you're dealing with an acrobat, you can have another acrobat come in and swing. With music, when you take out one of the instruments, unless you have somebody else play that instrument, they were using this backup system. And I guess there was tension with the backup system as far as getting it coordinated. So they were much more concerned, fairly, much more concerned about this ability or the conflict that happened there. The other thing I think is pretty self-evident, and that is, again, with somebody who's swinging from a swing or whatever they do, injuries are too anticipated. And as you're going to fire people, you're going to have some real problems, whereas the band is kind of a little segregated unit, and they just want them to go out there and play every day. And no one, they're seen very seldom. And to the extent that there's a problem, you know, just get rid of them. But that's why the law should protect them. Okay. Any further questions from the bench? Thank you very much. The case of Brown v. Cirque du Soleil, Nevada is now submitted for decision.
judges: Hug, W. Fletcher, Clifton